## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| KELLY ROSZEL, Derivatively on Behalf of Nominal Defendant SELECTQUOTE, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:26-cv-00801 |
| DONALD HAWKS III, TIMOTHY DANKER, EARL DEVANNY III, DENISE DEVINE, RAYMOND WELDON, KAVITA PATEL, SRDJAN VUKOVIC, CHRISTOPHER WOLFE, RYAN CLEMENT, RAFFAELE SADUN, and ROBERT GRANT, | ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants, | ) ) | |
| and | ) ) | |
| SELECTQUOTE, INC., | ) ) | |
| Nominal Defendant. | ) | |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Kelly Roszel ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant SelectQuote, Inc. ("SelectQuote" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things: a review of the Company's publicly available documents, conference call transcripts and public announcements, United States Securities and Exchange Commission

("SEC") filings, press releases published by and regarding SelectQuote, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of SelectQuote against certain officers and members of the Company's Board for breaches of their fiduciary duties and other violations of law from September 9, 2020 and May 1, 2025, inclusive (the "Relevant Period"), as set forth below.

2.      According to its public filings, SelectQuote pioneered the model of providing "unbiased" comparisons from multiple, highly-rated insurance companies, allowing consumers to choose the policy and terms that best meet their unique needs.

3.      The Company reports its results in four segments: (i) Senior, which is the largest segment, representing 78% of the Company's total revenue in 2021; (ii) Life; (iii) Auto & Home; and (iv) Healthcare Services.

4.      As alleged below, throughout the Relevant Period, the Company touted its "unbiased" comparison shopping experience heavily. However, unknown to investors, prior to and throughout the Relevant Period, the Company regularly directed Medicare beneficiaries to plans offered by insurers that paid SelectQuote kickbacks, including Humana Inc. ("Humana") and Aetna, Inc. ("Aetna"), regardless of the quality or suitability of the insurers' plans.

5.      The truth was revealed on May 1, 2025, when the United States Department of Justice (the "DOJ") announced that it filed a 213-page complaint against the Company, asserting violations of the False Claims Act (the "DOJ Complaint"), in an action captioned *United States of America v. eHealth, Inc., et al.*, Case No. 21-cv-11777 (D. Mass.) (the "DOJ Action").

2

6.    The DOJ Complaint revealed, among other things, that: (i) "[f]rom 2016 through at least 2021," the Company received "tens of millions of dollars" in "illegal kickbacks" from health insurance companies in exchange for steering Medicare beneficiaries to enroll in the insurers' Medicare Advantage plans; (ii) the financial arrangements between the Company and insurers were falsely or misleadingly reported as "marketing" fees; (iii) in exchange for kickbacks, the Company engaged in conspiracies with Humana and Aetna to reduce enrollment of disabled beneficiaries; (iv) the Company made materially false claims by stating that it offers "unbiased coverage comparisons" when in it actually "repeatedly directed Medicare beneficiaries to the plans offered by insurers that paid them the most money, regardless of the quality or suitability of the insurers' plans"; and (v)  there was a series of incriminating internal communications that demonstrate "[d]efendants knew what they were doing was illegal."

7.    Following this news, the Company's stock price fell 19.2 percent, or $0.61 per share, to close at $2.56 per share on May 1, 2025.

8.    As a result of the foregoing and as set forth in greater detail herein, a securities fraud class action was filed against the Company, captioned *Pahlkotter v. SelectQuote, Inc.*, Case No. 1:25-cv-06620 (S.D.N.Y.) (the "Securities Class Action").

9.    The Securities Class Action has caused, and will continue to cause, SelectQuote to expend significant funds to defend itself against the claims asserted in that action, and exposed the Company to massive potential class-wide liability.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17

C.F.R.§240.14a-9) promulgated thereunder by the SEC, and Section 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder.

11.     Plaintiff's claims also raise a federal question regarding the claims made in the Securities Class Action based on violations of the Exchange Act.

12.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

15.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Defendants have conducted business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, and the Securities Class Action is pending in this District.

## PARTIES

*Plaintiff*

16.     Plaintiff is, and has been at all relevant times, a shareholder of SelectQuote.

*Nominal Defendant*

17.     Nominal Defendant SelectQuote is a Delaware corporation with its principal executive offices located at 6800 W. 115th Street, Suite 2511, Overland Park, Kansas 66211. SelectQuote's common stock trades on the NYSE under the ticker symbol "SLQT."

*Individual Defendants*

18.     Defendant Donald Hawks III ("Hawks") has served as a director of SelectQuote since 2014 and was appointed to serve as Chairman of the Board in February 2020. Hawks is Chair of the Nominating and Corporate Governance Committee.

19.     Defendant Timothy Danker ("Danker") has served as the Chief Executive Officer ("CEO") of SelectQuote since 2017 and also serves as a director of the Company. He served as President of the Company's Life segment from 2016 to 2019, as Executive Vice President of the Company's Life segment from 2015 to 2016, and as President of the Company's Auto & Home segment from 2012 to 2015. Danker is named as a defendant in the Securities Class Action.

20.     Defendant Earl Devanny III ("Devanny") was appointed to serve as a director of SelectQuote in February 2020. Devanny is a member of the Audit Committee.

21.     Defendant Denise Devine ("Devine") was appointed to serve as a director of SelectQuote in February 2020. Devine is a member of the Audit Committee and the Nominating and Corporate Governance Committee.

22.     Defendant Raymond Weldon ("Weldon") has served as a director of SelectQuote since 2014. Weldon is Chair of the Audit Committee.

23.     Defendant Kavita Patel ("Patel") joined the SelectQuote Board in 2020. Patel is a member of the Nominating and Corporate Governance Committee.

24.     Defendant Srdjan Vukovic ("Vukovic") has served as a member of the Board of SelectQuote since February 2025.

25.     Defendant Christopher Wolfe ("Wolfe") has served as a member of the Board of SelectQuote since February 2025.

26.     Defendant Ryan Clement ("Clement") has served as Chief Financial Officer ("CFO") of SelectQuote since January 2022. Clement is named as a defendant in the Securities Class Action.

27.     Defendant Raffaele Sadun ("Sadun") served as the Company's CFO from 2017 until May 2022. Sadun is named as a defendant in the Securities Class Action.

28.     Defendant Robert Grant ("Grant") has served as President of the Company since 2021. He previously served as President of SelectQuote's Senior division from 2019 through 2021. Grant served as the Company's Chief Revenue Officer from 2017 through 2019, as Senior Vice President of Sales of the Life division from 2016 to 2017, and as Director of Sales and Operations for the Senior division from 2013 to 2016. Grant is named as a defendant in the Securities Class Action.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

29.     By reason of their positions as officers and/or directors of SelectQuote, and because of their ability to control the business and corporate affairs of SelectQuote, the Individual Defendants owed SelectQuote and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage SelectQuote in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of SelectQuote and its shareholders.

30.     Each director and officer of the Company owes to SelectQuote and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

31.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of SelectQuote, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

32.     To discharge their duties, the officers and directors of SelectQuote were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

33.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of SelectQuote, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

34.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

35.     To discharge their duties, the officers and directors of SelectQuote were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.   By virtue of such duties, the officers and directors of SelectQuote were required to, among other things:

(i)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to SelectQuote's own Code of Business Conduct and Ethics (the "Code of Conduct");

(ii)     Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)     Remain informed as to how SelectQuote conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of SelectQuote and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that SelectQuote's operations would comply with all applicable laws and SelectQuote's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

36.    Each of the Individual Defendants further owed to SelectQuote and the shareholders the duty of loyalty requiring that each favor SelectQuote's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

37.    At all times relevant hereto, the Individual Defendants were the agents of each other and of SelectQuote and were at all times acting within the course and scope of such agency.

38.    Because of their advisory, executive, managerial, and directorial positions with SelectQuote, each of the Individual Defendants had access to adverse, non-public information about the Company.

39.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by SelectQuote.

## SELECTQUOTE'S CODE OF CONDUCT

40.    SelectQuote's Code of Conduct provides:

Our officers, associates, business partners and our Board of Directors are held to the highest standards of ethics and are responsible for demonstrating behaviors consistent with those high standards and our core values.

This Code of Business Conduct and Ethics (this "Code") covers a wide range of business practices and procedures and is designed to maintain the standards of business conduct of the Company and ensure compliance with legal requirements, including Section 406 of the Sarbanes-Oxley Act of 2002 and SEC rules promulgated thereunder and Section 303A.10 of the New York Stock Exchange Listed Company Manual. . . .

Obeying the law, both in letter and in spirit, is the foundation on which our ethical standards are built. All of our officers, associates and directors (collectively our "Associates"), must respect and obey the laws and regulations of the United States, as well as the cities and states in which we serve our customers, and comply with all applicable laws and regulations designed to prevent and deter fraud, waste and abuse.

41.    The Code of Conduct further states:

Disclosure to the SEC and the Public

Our policy is to provide full, fair, accurate, timely, and understandable disclosure in reports and documents that we file with, or submit to, the SEC and in our other public communications. Accordingly, Associates must ensure that they and others in the Company comply with our disclosure controls and procedures and our internal controls for financial reporting. In the event any Associate believes or suspects that any information that is filed with, or submitted to the SEC, or otherwise made publicly available is materially inaccurate or misleading, or if such Associate has identified or has suspicion of a material weakness in the Company's public reporting procedures, such Associate shall promptly raise such concern with one of the following: the Chief Financial Officer, the General Counsel or the Chairman of the Audit Committee (or other member of the Audit Committee, as may be appropriate). Such report may be made on an anonymous basis.

42.    The Code of Conduct continues:

Financial Reporting and Record Keeping

All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to applicable legal requirements and to the Company's system of internal controls. Unrecorded or "off the books" funds or assets should not be maintained unless permitted by applicable law or regulation. The Company requires honest and accurate recording and reporting of information in order to make responsible business decisions. For example, only the true and actual number of hours worked should be reported.

Business records and communications often become public, and we should avoid exaggeration, derogatory remarks, guesswork, or inappropriate characterizations of people and companies that can be misunderstood. This applies equally to e-mail, internal memos, postings to social media sites, and formal reports. Records should always be retained or destroyed according to the Company's record retention policies. In accordance with those policies, in the event of litigation or governmental investigation please consult the Company's General Counsel.

## SELECTQUOTE'S AUDIT COMMITTEE CHARTER

43.     SelectQuote's Audit Committee is governed by its Audit Committee Charter.

44.     As set forth in the Audit Committee Charter:

The purpose of the Audit Committee of the Board of Directors (the "Board") of SelectQuote, Inc., a Delaware corporation (the "Company"), in order to assist the Board in fulfilling its responsibilities, shall be to oversee:

•The accounting and financial reporting processes of the Company and audits of the financial statements of the Company;

•The integrity of the Company's financial statements; the Company's compliance with legal and regulatory requirements; the independent auditor's qualifications, independence, performance, and compensation; and the Company's internal controls over financial reporting and disclosure controls and procedures;

•The preparation and approval of the reports and disclosures that the rules of the Securities and Exchange Commission (the "SEC") require be included in the Company's annual proxy statement;

•The Company's internal audit function;

•Transactions between the Company and a related party; and

•The application of the Company's Code of Business Conduct and Ethics.

In connection with the foregoing, the Audit Committee will provide the Board with the results of its monitoring and make recommendations derived from such monitoring. Further, the Audit Committee will provide the Board such additional information and materials as it may deem necessary to make the Board aware of significant financial matters that require the Board's attention.

45.     The Audit Committee Charter further provides:

The responsibilities of the Audit Committee shall include:

•Overseeing the Company's system of internal controls over financial reporting, including meeting periodically with the Company's management and the independent auditors to review the adequacy of such controls and to review the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings and the attestations or reports by the independent auditors relating to such disclosure; . . .

•Reviewing and providing oversight with respect to the external audit and the Company's relationship with its independent auditors by (i) reviewing the independent auditors' proposed audit scope, approach and independence for the annual audit and quarterly reviews for the current year; (ii) obtaining on a periodic basis a written statement from the independent auditors regarding relationships and services with the Company which may impact independence and presenting this statement to the Board, and to the extent there are relationships, monitoring and investigating them; (iii) discussing with the Company's independent auditors the financial statements and audit findings, including any significant adjustments, management judgments and accounting estimates, changes in the Company's selection or application of accounting principles, any difficulties encountered in the course of the audit work, suggestions for improvements provided to management by the independent auditors, any restrictions on the scope of activities or access to requested information, any significant disagreements with management and any other required communications described in applicable accounting standards, significant new accounting policies and any other matters described in PCAOB AS 1301 – Communications with Audit Committees, as may be modified or supplemented; and (iv) reviewing reports submitted to the audit committee by the independent auditors in accordance with the applicable SEC requirements;

•Reviewing and discussing with management and the independent auditors the annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," in connection with filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC;

•Engaging the Company's independent auditors to review, prior to filing with the SEC, the Company's interim financial statements included in Quarterly Reports on Form 10-Q, using professional standards and procedures for conducting such reviews;

•Reviewing, prior to announcement, the Company press releases containing material financial information and discussing with management whether such press releases properly disclose financial information presented in accordance with GAAP and, to the extent non-GAAP information is included, applicable rules and regulations of the SEC governing the disclosure of such non-GAAP information;

•Overseeing compliance with the requirements of the SEC and the New York Stock Exchange for disclosure of auditor's services and audit committee members, member qualifications and activities;

•At least annually, obtaining and reviewing a report by the independent auditor describing the audit firm's internal quality-control procedures and any material issues raised by the most recent internal quality-control procedures and any material issues raised by the most recent internal quality-control, peer review or any inquiry or investigation by governmental or professional authorities within the preceding two years, and any steps to deal with any identified issues; . . .

•Discussing with management and the independent auditors correspondence with regulators or governmental agencies that raise material issues regarding the Company's financial statements or accounting policies and the effect of regulatory and accounting initiatives, as well as off-balance-sheet structures on the Company's financial statements;

•Reviewing management's monitoring of compliance with the Foreign Corrupt Practices Act, the UK Anti-Bribery Act and any other similar laws;

•Annually reviewing and providing to the Board for its approval the Company's Code of Business Conduct and Ethics, in accordance with applicable law;

•Reviewing annually the results of the annual Certification of the Code of Business Conduct and Ethics with management, and the disposition of all instances of noncompliance as appropriate;

•Setting clear hiring policies for employees or former employees of the Company's independent auditors, consistent with SEC and the New York Stock Exchange regulations and guidelines; . . .

•Reviewing, in conjunction with counsel, any legal matters that could have a significant impact on the Company's financial statements;

•Reviewing and discussing with management and the independent auditor the Company's financial risk exposures (including its investment policies) and assessing the policies and processes management has implemented to monitor and control such exposures;

•Assisting the Board in fulfilling its oversight responsibilities regarding the Company's policies and processes with respect to enterprise risk assessment and management, including any significant non-financial risk exposures;

•Reviewing the adequacy and effectiveness of the Company's information security policies and the internal controls regarding information security;

•If necessary, instituting special investigations with full access to all books, records, facilities and personnel of the Company;

•Obtaining advice and assistance from outside legal, accounting or other advisors, with any resulting expenses being paid by the Company;

•Reviewing in advance and approving all transactions between the Company and a related party for which review or approval is required by applicable law or that are required to be disclosed in the Company's financial statements or SEC filings;

•At least annually, reviewing its own charter, structure, processes, and membership requirements and performing an annual self-evaluation of its performance;

•Providing a report in the Company's proxy statement in accordance with the rules and regulations of the SEC;

•Establishing procedures for receiving, retaining and treating complaints received by the Company regarding accounting, internal accounting controls or auditing matters and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting, internal accounting controls, auditing matters or related matters;

•Reviewing and advising the Chief Executive Officer and the Board with respect to the appointment, dismissal and replacement of the chief financial officer (and chief accounting officer) and consulting with the Chief Executive Officer about the performance goals and subsequent performance evaluation and compensation of each;

•Reviewing the performance, and determining the scope, roles and responsibilities, of the Company's internal audit function, including: (i) assessing resource requirements (internal, external and/or combined); (ii) reviewing with management and the chief internal audit executive any Internal Audit Charter, audit plans, activities, staffing and organizational structure of the internal audit function; (iii) ensuring there are no unjustified restrictions or limitations on the chief internal audit executive; (iv) reviewing any significant reports to management prepared by the internal audit department, including management's adoption and resolution of the internal audit department's recommendations; (v) reviewing the effectiveness of the internal audit function annually as part of the year-end external audit and reporting process; and (vi) on a regular basis, meeting separately with the chief internal audit executive to discuss any matters that the Audit Committee or internal audit believes should be discussed privately;

•Reviewing and discussing with executive management, and recommending to the Board, the appointment or dismissal of the chief internal audit executive and consulting with executive management about his or her performance goals and subsequent performance evaluation and compensation, and the application of the

Company's compensation policies to other internal audit personnel;

•Reviewing and updating the Company's Whistleblower Policy and related procedures; and

•Any additional responsibility or authority mandated by the SEC, the New York Stock Exchange or other applicable rule or regulation.

## SUBSTANTIVE ALLEGATIONS

*Background*

46.    According to its public filings, SelectQuote pioneered the model of providing "unbiased" comparisons from multiple, highly-rated insurance companies, allowing consumers to choose the policy and terms that best meet their unique needs.

47.    The supposed unbiased natured of SelectQuote's services was integral to the Company, allowing customers to select policies based on their particular needs instead of a specific carrier's internal sales goals.

48.    Throughout the Relevant Period, the Company touted its "unbiased" comparison shopping experience heavily. Indeed, nearly all press releases SelectQuote disseminated tout that SelectQuote "pioneered the model of providing unbiased comparisons."

49.    The Company reports its results in four segments: (i) Senior, which is the largest segment, representing 78% of the Company's total revenue in 2021; (ii) Life; (iii) Auto & Home; and (iv) Healthcare Services.

50.    Medicare Supplement and Medicare Advantage plans account for a majority of SelectQuote's approved Senior policies. For example, in 2020, Medicare Supplement and Medicare Advantage plans constituted seventh-eight percent of Senior polices sold. By 2024, that number increased to ninety-one percent.

51.    Throughout the Relevant Period, SelectQuote claimed to provide "***unbiased comparison shopping for Medicare Advantage . . . and Medicare Supplement . . . insurance***

*plans*."[1]

52.     In the Company's press releasees, Forms 10-Q, and Forms 10-K filed with the SEC during the Relevant Period, SelectQuote highlighted its purportedly "unbiased comparison shopping" services and its "***agents . . . trained to offer unbiased advice in order to align with the specific needs of each customer***."

53.     The Company claims to generate revenue from its Senior segment principally by earning commissions from selling Medicare-related health insurance products, including Medicare Supplement, Medicare Advantage, prescription drug plans, and other products on behalf of insurance carrier partners. If consumers purchase policies through the Company, it earns a commission from insurance carrier partners for the first year of the policy and for each subsequent year the policy renews.

54.     Moreover, the Company received other revenue from "production bonuses," which were based on reaching predetermined target sales levels, other objectives, and "marketing development funds," which were supposedly used to purchase leads.

55.     However, SelectQuote is limited by federal regulations with respect to the amount and nature of compensation it can receive from insurers. These regulations exist to protect customers from kickbacks being paid to steer customers into insurance plans that benefit the Company and preferred partners instead of customers.

56.     Unknown to investors, throughout the Relevant Period, the Company: (i) regularly directed Medicare beneficiaries to plans offered by insurers that paid SelectQuote kickbacks, regardless of the quality or suitability of the insurers' plans; and (ii) reduced or limited the proportion of persons with disabilities that SelectQuote directed toward insurers that paid them

---

[1] Unless otherwise indicated, all emphasis is added.

since those insurers perceived Medicare beneficiaries with disabilities to be more costly and less profitable than beneficiaries who were eligible for Medicare because of age.

57.    Starting in 2016 through at least 2021, the Company solicited and received kickbacks from insurance providers Humana and Aetna. The Company received millions of dollars of "market development funds" from Humana and Aetna for extra-contractual commitments to sell specific quantities of Medicare Advantage policies. These kickbacks were in addition to permitted per-enrollment compensation that the insurers paid to the Company.

58.    Humana received preferential enrollment treatment from the Company based on kickbacks, including by establishing "teams" or "pods" of agents who either only sold Humana plans or received extra remuneration for selling Humana's plans.

59.    From 2016 through at least 2021, Humana conditioned some of its kickbacks on the Company reducing and/or limiting the proportion of persons with disabilities that brokers enrolled in their plans, as it perceived Medicare beneficiaries with disabilities to be more costly and less profitable than beneficiaries who were eligible for Medicare because of age.

60.    In July 2016, the Company created a subsidiary, Tiburon Insurance Services ("Tiburon"), which would operate its "pod" of agents for Humana. From 2016 to 2018, Tiburon's pod sold only Humana plans.

61.    Throughout 2020, Humana paid the Company a total of approximately $18.7 million in purported marketing funding. They signed contracts that supposedly provided for Humana to pay the Company in exchange for a "targeted marketing campaign." However, in reality, the funds were intended as remuneration for enrollments and preferential treatment, in violation of state and federal law. In exchange for the payments, the Company promised to and took actions to steer Medicare enrollments to Humana, even if the service was inferior.

62.     This scheme continued into 2021, when Humana paid the Company approximately $29.5 million in supposed marketing funding. On September 1, 2021, Humana agreed to pay the Company $10 million, purportedly for "a targeted marketing campaign between October 1, 2021 and December 7, 2021" that would "include the purchase and use of leads." The Company also offered Humana the opportunity to pay greater kickbacks for more enrollments into Humana's Medicare Advantage plans.

63.     Similarly, starting in fall 2017, Aetna paid the Company kickbacks disguised as "marketing" money to induce the Company to steer business to Aetna.

64.     In 2020, Aetna paid the Company almost $4.9 million in "market development funding." However, these funds were intended as remuneration for enrollments and preferential treatment, in violation of state and federal law. In exchange for the payments, the Company promised to and took actions to steer Medicare enrollments to Aetna. Aetna was also added to the Tiburon "pod."

65.     Aetna offered and paid the Company bonuses, rewards, and kickers that were disguised as "marketing" funding to incentivize Medicare Advantage sales in specific geographic areas.

66.     In 2021, Aetna paid the Company approximately $7.4 million in "marketing" money. In exchange, the Company continued to steer Medicare enrollments to Aetna, regardless of the suitability of the plan.

67.     Moreover, during the Relevant Period until at least 2021, the Company conspired with Aetna to limit the proportion of beneficiaries with disabilities enrolled in Aetna Medicare Advantage plans, in violation of federal law. Aetna not only conditioned the Company's "marketing" funding on the number of beneficiaries brokers enrolled in Aetna Medicare

Advantage plans, but also on the type of Medicare beneficiary that it enrolled in Aetna Medicare Advantage plans. Aetna set goals for the Company to ensure that the number of disabled Medicare beneficiaries did not exceed a certain percentage of beneficiaries enrolled in Aetna Medicare Advantage plans and would not pay "marketing" money if the ratio of disabled to non-disabled beneficiaries was higher than what Aetna deemed acceptable.

68.     Defendants understood that the Company's kickback arrangements and resulting preferences for paying insurers resulted in problems for beneficiaries.

***Materially False and Misleading Statements***

69.     On September 9, 2020, the Company issued a press release wherein it reported its fourth quarter and full fiscal year 2020 financial results, which was also filed with the SEC as Exhibit 99.1 to a Form 8-K signed by Defendant Sadun. The press release stated that SelectQuote's business model is based on "providing unbiased comparisons" to allow "consumers to choose the policy and terms that best meet their unique needs." The press release provided:

> The company pioneered the direct-to-consumer ***model of providing unbiased comparisons*** from multiple, highly-rated insurance companies ***allowing consumers to choose the policy and terms that best meet their unique needs. Two foundational pillars underpin SelectQuote's success:*** a force of more than 1,000 highly-trained and skilled ***agents who provide a consultative needs analysis for every consumer,*** and ***proprietary technology that sources, scores, and routes high-quality sales leads.***

70.     Also on September 9, 2020, SelectQuote hosted an earnings call, in which Defendants Danker, Sadan and Grant participated. Danker touted SelectQuote's supposed "***differentiated operational processes***" including its alleged "***mission agnostic agent lead model,***" which he stated was "***the best way to achieve the best outcome for our customers.***" Danker stated:

> SelectQuote ended the fourth quarter with consolidated revenues of $141 million, up 90% year-over-year, and adjusted EBITDA of $40 million, up 106% year-over-year. Both were ahead of our internal expectations, and represent the continued strength in both our Senior and Life Divisions, which we will detail in a minute.

On a consolidated basis, we reported net income of $20 million, or diluted earnings per share of $0.13. This dramatic growth reflects not only the very large growth opportunity in the Senior market, but also the ***differentiated operational processes we had built into our model*** over the last 35 years that have ***enabled us to take advantage of this opportunity.*** We're going to spend some time talking to those differentiators today as well. . . .

Turning to the right side of the page, we also firmly believe that our highly trained and 100% in-house agent workforce is a key differentiating asset for SelectQuote. The complexity and deciding upon an insurance policy is daunting for most people, and the stakes pertaining to details like physician networks and prescription drugs can prove costly. We believe our ***internal mission agnostic agent lead model is the best way to achieve the best outcome for our customers*** and simultaneously maximize the return SelectQuote earns on acquiring that same policyholder.

71.    On September 10, 2020, the Company filed its annual report on Form 10-K with the SEC (the "FY20 10-K"), which was signed by Defendants Danker and Sadun. The FY20 10-K stated that SelectQuote provides "***unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans.***" The FY20 10-K also provided: "SelectQuote Senior ("Senior"), our fastest growing and largest segment, was launched in 2010 and ***provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans***[.]"

72.    Moreover, the FY20 10-K stated that SelectQuote's "***agents are trained to offer unbiased advice in order to be more aligned to the specific needs of each customer.***" The FY20 10-K provided:

We believe providing personalized advice and guidance from policy research to enrollment is a key differentiator in the senior health market as consumers tend to prefer or require more personalized attention to navigate increasingly complex and ever-changing coverage options. ***Our agents are trained to offer unbiased advice in order to be more aligned to the specific needs of each customer.***

73.    The FY20 10-K purported to warn of the risks to SelectQuote, including risks related to compliance with laws and regulations, which "***may***" or "***could***" impact SelectQuote. The FY20 10-K provided:

*Our Senior segment is subject to a complex legal and regulatory framework, and non-compliance with or changes in laws and regulations governing the marketing and sale of Medicare plans could harm our business, operating results, financial condition and prospects.*

Our Senior segment is subject to a complex legal and regulatory framework and the laws and regulations governing the marketing and sale of Medicare plans, particularly with respect to regulations and guidance issued by CMS for Medicare Advantage and Medicare Part D prescription drug plans, change frequently. *Changes to the laws, regulations and guidelines relating to Medicare plans, their interpretation or the manner in which they are enforced could harm our business, operating results, financial condition and prospects.*

*Changes to laws, regulations, CMS guidance or the enforcement or interpretation of CMS guidance applicable to our Senior segment could cause insurance carriers or state departments of insurance to object to or not to approve aspects of our marketing materials and processes. As a result, those authorities may determine that certain aspects of our Senior segment are not in compliance with the current legal and regulatory framework. Any such determinations could delay or halt the operation of our Senior segment, which would harm our business, operating results, financial condition and prospects, particularly if such delay or halt occurred during the Medicare annual or open enrollment periods.*

74.     On November 5, 2020, the Company issued a press release wherein it reported its first quarter 2021 financial results. The press release stated:

The company pioneered the direct-to-consumer *model of providing unbiased comparisons* from multiple, highly-rated insurance companies *allowing consumers to choose the policy and terms that best meet their unique needs. Two foundational pillars underpin SelectQuote's success:* a force of more than 1,000 highly-trained and skilled *agents who provide a consultative needs analysis for every consumer,* and *proprietary technology that sources, scores, and routes high-quality sales leads.*

75.     Also on November 5, 2020, SelectQuote hosted an earnings call, in which Defendants Danker, Sadan, and Grant participated. Danker touted that SelectQuote's Senior division Medicare Advantage sales success "underscores the value" of its alleged "*true consumer choice model.*" Danker stated:

I'll start with the Senior market as a whole. Overall, growth for Medicare Advantage market is expected to be in the 10% range as forecasted by CMS, with total Medicare Advantage enrollment increasing to approximately 27 million

Americans. On top of that plan, choices will increase about 20% this year. We believe this increasing complexity underscores the value of our ***true consumer choice model.***

76.    When asked by an analyst if SelectQuote is agnostic on insurance carrier sales, Defendant Sadun stated that any shift in the mix of providers it connects was "***not driven by our agents steering business one way or the other"*** as SelectQuote is ***"an open platform.***" Sadun further stated that, if a carrier was receiving a larger mix of total plans sold, "***it's really a function of those carriers having plans which are competitive in the marketplace***." Sadun further stated that SelectQuote is an "***agnostic platform.***" Sadun stated:

> [Analyst]: . . . And then you just mentioned the differences and persistency between carriers. So wondering, ***are you agnostic on the carrier when selling given that?*** . . .

> [Sadun:] . . . In terms of different carriers having different persistency, in general, they are in a range, but yes, different carriers do have a slightly different persistency. And we have seen a mix shift towards carriers that have higher persistency. Now, ***that's not driven by our agents steering business one way or the other. We're an open platform.*** And so it's really a function of those carriers having plans which are competitive in the marketplace, and those plans basically taking a larger piece of share. . . .

> So we feel really strong about that, especially in regards to kind of our book and the conversations that we get to have with our book, which would be - on the first one as far as the switchers. And then to your second question, ***as far as when we bring a carrier on, it really depends on the size, scale and competitiveness of that carrier. Since we are an agnostic platform***, it will really depend on the size of that.

77.    On November 6, 2020, the Company filed a Form 10-Q with the SEC for the period ending September 30, 2020. The Form 10-Q provided: "SelectQuote Senior ("Senior"), our fastest growing and largest segment, was launched in 2010 and ***provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans***[.]"

78.    The same statements were repeated in the Company's Forms 10-Q filed on February 8, 2021 and May 12, 2021 and in its Form 10-K filed on August 26, 2021 (the "FY21

10-K"). Each of these documents was signed by Defendants Danker and Sadun.

79.     Moreover, the FY21 10-K provided:

We believe providing personalized advice and guidance from policy research to enrollment is a key differentiator in the senior health market as consumers tend to prefer or require more personalized attention to navigate increasingly complex and ever-changing coverage options. ***Our agents are trained to offer unbiased advice in order to be more aligned to the specific needs of each customer.***

80.     The FY21 10-K purported to warn of the risks to SelectQuote, including risks

related to compliance with laws and regulations, which "***may***" or "***could***" impact SelectQuote. The

FY21 10-K provided:

***Our Senior segment is subject to a complex legal and regulatory framework, and non-compliance with or changes in laws and regulations governing the marketing and sale of Medicare plans could harm our business, operating results, financial condition and prospects.***

Our Senior segment is subject to a complex legal and regulatory framework and the laws and regulations governing the marketing and sale of Medicare plans, particularly with respect to regulations and guidance issued by CMS for Medicare Advantage and Medicare Part D prescription drug plans, change frequently.

***Changes to the laws, regulations and guidelines relating to Medicare plans, their interpretation or the manner in which they are enforced could harm our business, operating results, financial condition and prospects.***

***Changes to laws, regulations, CMS guidance or the enforcement or interpretation of CMS guidance applicable to our Senior segment could cause insurance carriers or state departments of insurance to object to or not to approve aspects of our marketing materials and processes. As a result, those authorities may determine that certain aspects of our Senior segment are not in compliance with the current legal and regulatory framework. Any such determinations could delay or halt the operation of our Senior segment, which would harm our business, operating results, financial condition and prospects, particularly if such delay or halt occurred during the Medicare annual or open enrollment periods***.

81.     On February 8, 2021, the Company issued a press release wherein it reported its

second quarter 2021 financial results. The press release stated:

The company pioneered the direct-to-consumer ***model of providing unbiased comparisons*** from multiple, highly-rated insurance companies ***allowing***

*consumers to choose the policy and terms that best meet their unique needs. Two foundational pillars underpin SelectQuote's success*: a strong force of highly-trained and skilled *agents who provide a consultative needs analysis for every consumer*, and *proprietary technology that sources, scores, and routes high-quality sales leads.*

82.    The same statements were repeated in the Company's press releases reporting financial results for the third quarter 2021 and the fourth quarter and full fiscal year 2021, issued and filed with the SEC on May 11, 2021 and August 25, 2021, respectively.

83.    Also on February 8, 2021, SelectQuote hosted an earnings call regarding its second quarter 2021 financial results, in which Defendants Danker, Sadun, and Grant participated. Danker touted how SelectQuote's agents allegedly "*conduct a thorough personalized needs-based assessment for each customer to make sure they find the right policy for them.*" Danker further highlighted how the Company's call routing technology assisted in the performance of this function, including to "*best match leads to the right agents based on close rates and service quality*." Danker stated:

> Our agents don't just process information efficiently, but they conduct a thorough *personalized needs-based assessment for each customer to make sure they find the right policy for them*. . . .
>
> There certainly isn't time on this call to speak to each component of our technology, so let me provide one example across our marketing and lead workflow on slide 7. At the highest level, we have built custom technology at every step of the process from the lead buying decision to how those leads are scored enriched and routed. We begin with our wide funnel approach to aggregate leads from a variety of sources that can be toggled up and down based upon what the market environment presents us.
>
> From there we've developed proprietary technology called SelectBid by leveraging investments in data science SelectBid allows us to make intelligent real-time lead buying and pricing decisions by combining the *lead data with our historical performance data, third-party data and custom algorithms to predict the expected LTV of a customer and prices to bid accordingly*. From there we apply similar data science to *best match leads to the right agents based on close rates and service quality*.

24

When the agent enters the process we apply just as much technology at the customer service level. We've developed robust tools to **match customers and plans against the best combination of doctor's, prescription drugs and their future medical needs**.

84.    On May 3, 2021, the Company hosted a conference call regarding the Company's new Population Health platform. During the call, Defendant Danker touted how the Company's sales force scanned the market for consumers so they could make the most well-informed choices about their healthcare decisions. Danker stated:

[L]et's begin on Slide 3 with a brief overview of our core insurance distribution business and why our holistic approach to customer intelligence and service is also at the heart of our Population Health initiative. **SelectQuote is a leading technology-enabled, direct-to-consumer insurance distribution platform. We pioneered the first direct-to-consumer sale of term life back in 1985 through a model that combined direct marketing, technology and a professional inside sales force that compares and shop[s] the market to find the best fit for each consumer.**

Our convenient, customer-centric approach is best articulated by our tagline, we shop, you save. Over the last decade, SelectQuote Senior has grown into our largest division, with year-over-year revenue growth exceeding 100% for the last 4 consecutive quarter

85.    Defendant Grant also touted the Company's "customer first" approach, stating:

. . . SelectQuote Senior has grown into the market leader in Medicare plan distribution by **always putting the customer first**. We feel our industry-leading retention and LTVs are a testament to the great advice our 100% internal agent force delivers every day. **This customer-first attitude has helped us achieve these results, and that attitude has also driven our decision to enter into the health care space**.

86.    On November 4, 2021, the Company issued a press release wherein it reported its first quarter 2022 financial results. The press release provided:

The company pioneered the direct-to-consumer **model of providing unbiased comparisons** from multiple, highly-rated insurance companies **allowing consumers to choose the policy and terms that best meet their unique needs. Two foundational pillars underpin SelectQuote's success:** a strong force of highly-trained and skilled **agents who provide a consultative needs analysis for every consumer,** and **proprietary technology that sources, scores, and routes high-quality sales leads.**

25

87.    The same statements were repeated in the Company's press release reporting second quarter 2022 financial results issued and filed with the SEC on February 7, 2022.

88.    On November 5, 2021, the Company filed a Form 10-Q with the SEC for the first quarter of 2022. The Form 10-Q stated: "SelectQuote Senior ("Senior"), our fastest growing and largest segment, was launched in 2010 and ***provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans***[.]"

89.    On February 14, 2022, the Company filed a Form 10-Q with the SEC for the second quarter of 2022. The Form 10-Q provided: "Senior, our fastest growing and largest segment, was launched in 2010 and ***provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans***[.]"

90.    The same statements were repeated in the Company's Form 10-Q for the third quarter 2022 filed with the SEC on May 5, 2022, which, along with the first quarter and second quarter Forms 10-Q, were signed by Defendants Danker and Sadun. The same statements were also repeated in the Company's Form 10-K for the 2022 fiscal year filed with the SEC on August 29, 2022 (the "FY22 10-K"), which was signed by Defendants Danker and Clement.

91.    The FY22 10-K further provided:

We believe providing personalized advice and guidance from policy research to enrollment is a key differentiator in the senior health market as consumers tend to prefer or require more personalized attention to navigate increasingly complex and ever-changing coverage options. ***Our agents are trained to offer unbiased advice in order to be more aligned to the specific needs of each customer.***

92.    The FY22 10-K purported to warn of the risks to SelectQuote, including risks related to compliance with laws and regulations, which "***may***" or "***could***" impact SelectQuote. The FY22 10-K provided:

***Our Senior segment is subject to a complex legal and regulatory framework, and non-compliance with or changes in laws and regulations governing the marketing and sale of Medicare plans and other healthcare-related products and services could harm our business, operating results, financial condition and prospects.***

Our Senior segment is subject to a complex legal and regulatory framework, and the laws and regulations governing the marketing and sale of Medicare plans, particularly with respect to regulations and guidance issued by CMS related to Medicare Advantage and Medicare Part D prescription drug plans, change frequently. ***Changes to the laws, regulations and guidelines relating to Medicare plans, their interpretation or the manner in which they are enforced could harm our business, operating results, financial condition and prospects.***

***Changes to laws, regulations, CMS guidance or the enforcement or interpretation of CMS guidance applicable to our Senior segment could cause insurance carriers or state departments of insurance to object to or not to approve aspects of our marketing materials and processes. As a result, those authorities may determine that certain aspects of our Senior segment are not in compliance with the current legal and regulatory framework. Any such determinations could delay or halt the operation of our Senior segment, which would harm our business, operating results, financial condition and prospects, particularly if such delay or halt occurred during the Medicare annual or open enrollment periods.***

93.    On May 5, 2022, the Company issued a press release wherein it reported its third quarter 2022 financial results. The press release provided:

SelectQuote pioneered the ***model of providing unbiased comparisons*** from multiple, highly-rated insurance companies ***allowing consumers to choose the policy and terms that best meet their unique needs. Two foundational pillars underpin the company's success:*** a strong force of highly-trained and skilled ***agents who provide a consultative needs analysis for every consumer***, and ***proprietary technology that sources and routes high-quality leads.***

94.    The same statements were repeated in the Company's press release announcing fourth quarter and full year 2022 financial results issued and filed with the SEC on August 29, 2022.

95.    On November 3, 2022, SelectQuote issued a press release wherein it reported its first quarter 2023 financial results. The press release was also filed with the SEC as Exhibit 99.1 to a Form 8-K, which was signed by Defendant Clement. The press release stated that the

Company's business model is based on "providing unbiased comparisons" to allow "consumers to choose the policy and terms that best meet their unique needs." The press release stated:

> The company pioneered the **model of providing unbiased comparisons** from multiple, highly-rated insurance companies **allowing consumers to choose the policy and terms that best meet their unique needs. Two foundational pillars underpin SelectQuote's success:** a strong force of highly-trained and skilled **agents who provide a consultative needs analysis for every consumer,** and **proprietary technology that sources and routes high-quality leads.**

96.     The same statements were repeated in the Company's press releases reporting second quarter 2023, third quarter 2023, and fourth quarter and full year 2023 financial results, issued and filed with the SEC on February 7, 2023, May 10, 2023, and September 13, 2023, respectively.

97.     Also on November 3, 2022, the Company filed a Form 10-Q with the SEC for the first quarter of 2023, which was signed by Defendants Danker and Clement. The Form 10-Q stated that SelectQuote provides "**provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans.**" The Form 10-Q further provided: "Senior was launched in 2010 and **provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans**[.]"

98.     The same statements were repeated in the Company's Forms 10-Q for the second quarter and third quarter 2023 as well as in its Form 10-K for the fiscal year 2023 (the "FY23 10-K"), filed with the SEC on February 7, 2023, May 10, 2023, and September 13, 2023, respectively. Each of the Forms 10-Q and the Form 10-K was signed by Defendants Danker and Clement.

99.     The FY23 10-K provided:

> We believe providing personalized advice and guidance from policy research to enrollment is a key differentiator in the senior health market as consumers tend to prefer or require more personalized attention to navigate increasingly complex and ever-changing coverage options. **Our agents are trained to offer unbiased advice in order to be more aligned to the specific needs of each customer.**

100.    The FY23 10-K purported to warn of the risks to SelectQuote, including risks related to compliance with laws and regulations, which "*may*" or "*could*" impact SelectQuote. The FY23 10-K provided:

> ***Our Senior segment is subject to a complex legal and regulatory framework, and non-compliance with or changes in laws and regulations governing the marketing and sale of Medicare plans and other healthcare-related products and services could harm our business, operating results, financial condition and prospects.***
>
> Our Senior segment is subject to a complex legal and regulatory framework, and the laws and regulations governing the marketing and sale of Medicare plans, particularly with respect to regulations and guidance issued by CMS related to Medicare Advantage and Medicare Part D prescription drug plans, change frequently. For example, in April 2023, CMS finalized rules that could increase compliance costs and otherwise impact our business results by, among other things, requiring new disclosures that could make certain forms of marketing less practicable and potentially requiring a 48-hour waiting period between initial contact with a beneficiary and enrolling that beneficiary. ***These and any other changes to the laws, regulations and guidelines relating to Medicare plans, their interpretation or the manner in which they are enforced could harm our business, operating results, financial condition and prospects.***
>
> ***In addition, changes to laws, regulations, CMS guidance or the enforcement or interpretation of CMS guidance applicable to our Senior segment could cause insurance carriers or state departments of insurance to object to or not to approve aspects of our marketing materials and processes. As a result, those authorities may determine that certain aspects of our Senior segment are not in compliance with the current legal and regulatory framework. Any such determinations could delay or halt the operation of our Senior segment, which would harm our business, operating results, financial condition and prospects, particularly if such delay or halt occurred during the Medicare annual or open enrollment periods.***

101.    On November 2, 2023, SelectQuote issued a press release wherein it reported its first quarter 2024 financial results, which was filed with the SEC as Exhibit 99.1 to a Form 8-K signed by Defendant Clement. The press release stated that SelectQuote's business model is based on "***providing unbiased comparisons***" to allow "***consumers to choose the policy and terms that best meet their unique needs.***" The press release provided:

The company pioneered the model of providing **unbiased comparisons** from multiple, highly-rated insurance companies *allowing consumers to choose the policy and terms that best meet their unique needs. Two foundational pillars underpin SelectQuote's success:* a strong force of highly-trained and skilled *agents who provide a consultative needs analysis for every consumer*, and *proprietary technology that sources and routes high-quality leads*.

102.    The same statements were repeated in the Company's press releases reporting financial results for the second quarter, third quarter, and fourth quarter and full year 2024, issued and filed with the SEC on February 7, 2024, May 9, 2024, and September 13, 2024, respectively.

103.    On November 3, 2023, the Company filed a Form 10-Q with the SEC for the first quarter of 2024, which was signed by Defendants Danker and Clement. The Form 10-Q stated that SelectQuote "*provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans.*" The Form 10-Q further provided: "Senior was launched in 2010 and *provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans*[.]"

104.    The same statements were repeated in the Company's Forms 10-Q for the second quarter and third quarter 2024 as well as in the Form 10-K for the fiscal year 2024 (the "FY24 10-K"), filed with the SEC on February 8, 2024, May 9, 2024, and September 13, 2024, respectively. Each of the Forms 10-Q and Form 10-K were signed by Defendants Danker and Clement.

105.    The FY24 10-K purported to warn of the risks to SelectQuote, including risks related to compliance with laws and regulations, which "*may*" or "*could*" impact SelectQuote. The FY24 10-K provided:

> *Our Senior segment is subject to a complex legal and regulatory framework, and non-compliance with or changes in laws and regulations governing the marketing and sale of Medicare plans and other health-related products and services could harm our business, operating results, financial condition and prospects.*

Our Senior segment is subject to a complex legal and regulatory framework, and the laws and regulations governing the marketing and sale of Medicare plans, particularly with respect to regulations and guidance issued by CMS related to Medicare Advantage and Medicare Part D Prescription Drug plans, change frequently. For example, in April 2023, CMS finalized rules that could increase compliance costs and otherwise impact our business results by, among other things, requiring new disclosures that could make certain forms of marketing less practicable and potentially requiring a 48-hour waiting period between initial contact with a beneficiary and enrolling that beneficiary. In April 2024, CMS adopted final rules placing limitations on the compensation of certain distributors of Medicare products and establishing certain contractual standards for dual eligible special needs plans enrollments, among other things. To the extent they are determined to apply to our operations, ***these and any other changes to the laws, regulations and guidelines relating to Medicare plans, their interpretation, or the manner in which they are enforced could harm our business, operating results, financial condition and prospects.***

***In addition, changes to laws, regulations, CMS guidance or the enforcement or interpretation of CMS guidance applicable to our Senior segment could cause insurance carriers or state departments of insurance to object to or not to approve aspects of our marketing materials and processes. As a result, those authorities may determine that certain aspects of our Senior segment are not in compliance with the current legal and regulatory framework. Any such determinations could delay or halt the operation of our Senior segment, which would harm our business, operating results, financial condition and prospects, particularly if such delay or halt occurred during the Medicare annual or open enrollment periods***.

106.    On November 4, 2024, SelectQuote issued a press release wherein it reported its first quarter 2025 financial results, which was filed with the SEC as Exhibit 99.1 to a Form 8-K signed by Defendant Clement. The press release stated that SelectQuote's business model is based on "***providing unbiased comparisons***" to allow "***consumers to choose the policy and terms that best meet their unique needs***." The press release provided:

The company pioneered the model of providing ***unbiased comparisons*** from multiple, highly-rated insurance companies ***allowing consumers to choose the policy and terms that best meet their unique needs.*** Two foundational pillars underpin SelectQuote's success: a strong force of highly-trained and skilled ***agents who provide a consultative needs analysis*** for every consumer, and ***proprietary technology that sources and routes high-quality leads***.

107.    Also on November 4, 2024, the Company filed a Form 10-Q with the SEC for the first quarter 2025. The Form 10-Q stated that SelectQuote "***provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans.***" The Form 10-Q also provided: "Senior was launched in 2010 and ***provides unbiased comparison shopping for Medicare Advantage ("MA") and Medicare Supplement ("MS") insurance plans***[.]"

108.    The same statements were repeated in the Company's Form 10-Q for the second quarter 2025 filed with the SEC on February 10, 2025. Both Forms 10-Q were signed by Defendants Danker and Clement.

109.    On February 10, 2025, SelectQuote issued a press release wherein it reported its second quarter 2025 financial results, which was filed with the SEC as Exhibit 99.1 to a Form 8-K signed by Defendant Clement. The press release provided:

> Founded in 1985, SelectQuote (NYSE: SLQT) pioneered the model of ***providing unbiased comparisons*** from multiple, highly-rated insurance companies, ***allowing consumers to choose the policy and terms that best meet their unique needs.*** Two foundational pillars underpin SelectQuote's success: a strong force of highly-trained and skilled ***agents who provide a consultative needs analysis*** for every consumer, and ***proprietary technology that sources and routes high-quality leads***.

110.    The above-referenced statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because, *inter alia*: (i) between 2016 and at least 2021, the Company steered beneficiaries into Medicare Supplement and Medicare Advantage insurance plans offered by insurers that paid kickbacks to the Company, without the beneficiaries' knowledge and without regard to the quality or suitability of the insurers' plans to the beneficiaries' individual needs; (ii) the Company's steering techniques included the use of "pods" of agents who exclusively or preferentially sold the Medicare Supplement and Medicare Advantage insurance plans of insurers that paid kickbacks to

the Company; (iii) the Company set up subsidiaries, including Tiburon, that did not offer unbiased advice aligned to the specific needs of each customer but instead consisted of exclusive or semi-exclusive agents posing as unbiased agents; (iv) the Company used "suppression tools" to remove competing insurers from its internal quoting tool for agents to favor insurers that paid kickbacks, without regard for the best interests of beneficiaries; (v) the Company's use of steering techniques in exchange for kickbacks violated state and federal laws and regulations, exposing the Company to potential civil and criminal liability and substantial reputational damage; (vi) the Company's steering practices were inconsistent with the Company's promise of providing "unbiased comparisons"; and (vii) the Company's statements touting an "unbiased" comparison model were materially misleading without disclosing the historical steering practices between 2016 and 2021.

***Proxy Statements***

111.    On September 29, 2020, the Individual Defendants caused the Company to file an annual proxy statement with the SEC (the "2020 Proxy Statement"). The 2020 Proxy Statement solicited the Company's stockholders:

> 1. To elect the two Class I directors named in the accompanying proxy statement to serve until the 2023 annual meeting of stockholders and until their successors are duly elected and qualified, subject to their earlier resignation or removal;
>
> 2. To ratify the appointment of Deloitte & Touche LLP as our independent registered public accounting firm for the fiscal year ending June 30, 2021; and
>
> 3. To transact any other business that properly comes before the Annual Meeting (including any adjournments, continuations and postponements thereof).

112.    With respect to Proposal 1 above, the 2020 Proxy Statement provided:

> Our Board has nominated Tim Danker and Kavita Patel for re-election as Class I directors to hold office until the 2023 annual meeting of stockholders or until their successors are duly elected and qualified, subject to their earlier resignation or removal. Each of the nominees is a current Class I director and member of our Board and has consented to serve if elected. . . .

OUR BOARD RECOMMENDS THAT YOU VOTE "FOR" THE ELECTION OF EACH OF THE NOMINEES.

113.    The 2020 Proxy Statement further stated:

One of the key functions of our Board is informed oversight of our risk management process. Our Board does not have a standing risk management committee, but rather administers this oversight function directly through our Board as a whole, as well as through its standing committees that address risks inherent in their respective areas of oversight. In particular, our Board is responsible for fulfilling its oversight responsibilities regarding the Company's policies and processes with respect to enterprise risk assessment and management, including any significant non-financial risk exposures.

Our audit committee is responsible for reviewing and discussing with management and the independent auditor our financial risk exposures (including our investment policies) and assessing the policies and process management has implemented to monitor and control such exposures. Our audit committee also monitors compliance with legal and regulatory requirements, in addition to oversight of the performance of our external audit function.

Our nominating and corporate governance committee monitors the effectiveness of our corporate governance guidelines and director practices and evaluates the composition, functions and duties of the committees of the Board.

Our compensation committee reviews and discusses the risks arising from our compensation policies, plans and programs applicable to all employees that are reasonably likely to have a materially adverse effect on us.

114.    On September 27, 2021, the Individual Defendants caused the Company to file an

annual proxy statement with the SEC (the "2021 Proxy Statement"). The 2021 Proxy Statement

solicited the Company's stockholders:

•To elect two Class II directors named in this proxy statement to serve until the 2024 annual meeting of stockholders or until their successors are duly elected and qualified ("Proposal 1");

•To ratify the appointment of Deloitte & Touche LLP as our independent registered public accounting firm for our fiscal year ending June 30, 2022 ("Proposal 2");

•To approve, by non-binding advisory vote, the Company's executive compensation ("Proposal 3");

•To recommend, by non-binding advisory vote, the frequency of future non-binding advisory votes on executive compensation ("Proposal 4"); and

•To transact such other matters as may properly come before the meeting and any adjournment or postponement thereof.

115.    With respect to Proposal 1, the 2021 Proxy Statement provided:

Our Class II directors, whose term will expire at the Annual Meeting, are Earl H. Devanny III and Raymond F. Weldon. The Board has nominated Messrs. Devanny and Weldon for election as Class II directors at the Annual Meeting, and each of them has consented to (i) serve as a nominee, (ii) be named as a nominee in this Proxy Statement, and (iii) continue to serve as a director if elected. If elected, Messrs. Devanny and Weldon will serve as directors until the Annual Meeting of Stockholders in 2024 and until their respective successors are elected and qualified, subject to earlier resignation or removal. . . .

The Board recommends that you vote "FOR" the election of each of the Class II director nominees.

116.    With respect to Proposal 3, the 2021 Proxy Statement stated:

In accordance with these objectives, and based on our performance in the 2021 Fiscal Year, the Board has concluded that our executive compensation program should be approved by stockholders, and asks them to approve the following resolution:

"RESOLVED, that the compensation paid to the Company's named executive officers, as disclosed pursuant to the rules of the Securities and Exchange Commission in the Compensation Discussion and Analysis section, compensation tables, and accompanying narrative discussion of our proxy statement in connection with our annual meeting of stockholders for the fiscal year ended June 30, 2021, is hereby APPROVED. . . . "

The Board recommends that you vote "FOR" the resolution to approve our executive compensation program as described in this Proxy Statement.

117.    The 2021 Proxy Statement further stated:

Informed oversight of our risk management policies and procedures is among the key functions of our Board. Specifically, the Board is responsible for fulfilling its oversight responsibilities regarding the Company's practices with respect to enterprise risk assessment and management, including exposure to any significant non-financial risks. While the Board has not established a separate risk management committee, the Board exercises its oversight of our risk management practices with the assistance of its existing standing committees, each of which

addresses risks inherent in its respective area of oversight.

In conjunction with management and our independent auditor, the Audit Committee is responsible for reviewing our exposure to certain financial risks and assessing the policies and procedures, including investment policies, implemented by management to monitor and control our exposure to these risks. The Audit Committee is responsible for monitoring our compliance with legal and regulatory requirements and overseeing the performance of our external audit function.

The Compensation Committee is responsible for evaluating and discussing any risks associated with our compensation policies, plans, and practices that are reasonably likely to have a material adverse effect on the Company.

The Nominating and Corporate Governance Committee is responsible for monitoring the effectiveness of our corporate governance practices, including our Corporate Governance Guidelines, and evaluating the duties, functions, and composition of the various standing committees of the Board.

118.    On October 6, 2022, the Individual Defendants caused the Company to file an annual proxy statement with the SEC (the "2022 Proxy Statement"). The 2022 Proxy Statement solicited the Company's stockholders:

To elect three Class III directors named in this proxy statement to serve until the 2025 annual meeting of stockholders or until their successors are duly elected and qualified ("Proposal 1");

To ratify the appointment of Deloitte & Touche LLP as our independent registered public accounting firm for our fiscal year ending June 30, 2023 ("Proposal 2");

To approve, by non-binding advisory vote, the compensation of the Company's named executive officers ("Proposal 3"); and

To transact such other matters as may properly come before the meeting and any adjournment or postponement thereof.

119.    With respect to Proposal 1, the 2022 Proxy Statement stated:

Our Class III directors, whose term will expire at the Annual Meeting, are Denise L. Devine, William Grant II, and Donald L. Hawks III. The Board has nominated Ms. Devine and Messrs. Grant and Hawks for election as Class III directors at the Annual Meeting, and each of them has consented to (i) serve as a nominee, (ii) be named as a nominee in this Proxy Statement, and (iii) continue to serve as a director if elected. If elected, Ms. Devine and Messrs. Grant and Hawks will serve as directors until the annual meeting of stockholders in 2025 and until their respective

successors are elected and qualified, subject to earlier resignation or removal. . . .

The Board recommends you vote "FOR" the election of each of the Class III director nominees.

120.    With respect to Proposal 3, the 2022 Proxy Statement stated:

In our first say-on-pay vote, which was held at last year's annual meeting, our 2021 executive compensation program was approved by more than 98% of votes cast. For the 2022 fiscal year, we retained the same compensation structure, continuing to emphasize "at-risk" compensation to further align the interests of our named executive officers with those of our stockholders. Our Board believes that our 2022 executive compensation program was effective in upholding our compensation philosophy and goals, delivering actual payouts that reflected our financial performance while enabling us to retain and motivate our key executives. For the reasons, the Board has concluded that our executive compensation program should be approved by stockholders, and asks them to approve the following resolution:

"RESOLVED, that the compensation paid to the Company's named executive officers, as disclosed pursuant to the rules of the Securities and Exchange Commission in the Compensation Discussion and Analysis section, compensation tables, and accompanying narrative discussion of our proxy statement in connection with our annual meeting of stockholders for the fiscal year ended June 30, 2022, is hereby APPROVED." . . .

The Board recommends that you vote "FOR" the approval of the compensation of our executive compensation program as described in this Proxy Statement.

121.    The 2022 Proxy Statement further stated:

Informed oversight of our risk management policies and procedures is among the key functions of our Board. Specifically, the Board is responsible for fulfilling its oversight responsibilities regarding the Company's practices with respect to enterprise risk assessment and management, including exposure to any significant non-financial risks. While the Board has not established a separate risk management committee, the Board exercises its oversight of our risk management practices with the assistance of its existing standing committees, each of which addresses risks inherent in its respective area of oversight.

In conjunction with management and our independent auditor, the Audit Committee is responsible for reviewing our exposure to certain financial risks and assessing the policies and procedures, including investment policies, implemented by management to monitor and control our exposure to these risks. The Audit Committee is responsible for monitoring our compliance with legal and regulatory requirements and overseeing the performance of our external audit function.

The Compensation Committee is responsible for evaluating and discussing any risks associated with our compensation policies, plans, and practices that are reasonably likely to have a material adverse effect on the Company.

The Nominating and Corporate Governance Committee is responsible for monitoring the effectiveness of our corporate governance practices, including our Corporate Governance Guidelines, and evaluating the duties, functions, and composition of the various standing committees of the Board.

122.    On October 4, 2023, the Individual Defendants caused the Company to file an annual proxy statement with the SEC (the "2023 Proxy Statement"). The 2023 Proxy Statement solicited the Company's stockholders:

To elect two Class I directors named in this proxy statement to serve until the 2026 annual meeting of stockholders or until their successors are duly elected and qualified ("Proposal 1");

To ratify the appointment of Deloitte & Touche LLP as our independent registered public accounting firm for our fiscal year ending June 30, 2024 ("Proposal 2");

To approve, by non-binding advisory vote, the compensation of the Company's named executive officers ("Proposal 3"); and

To transact such other matters as may properly come before the meeting and any adjournment or postponement thereof.

123.    With respect to Proposal 1, the 2023 Proxy Statement stated:

Our Class I directors, whose term will expire at the Annual Meeting, are Timothy R. Danker (our Chief Executive Officer) and Dr. Kavita K. Patel. The Board has nominated Mr. Danker and Dr. Patel for election as Class I directors at the Annual Meeting, and each of them has consented to (i) serve as a nominee, (ii) be named as a nominee in this Proxy Statement, and (iii) continue to serve as a director if elected. If elected, Mr. Danker and Dr. Patel will serve as directors until the annual meeting of stockholders in 2026 and until their respective successors are elected and qualified, subject to earlier resignation or removal. . . .

The Board recommends you vote "FOR" the election of each of the Class I director nominees.

124.    With respect to Proposal 3, the 2023 Proxy Statement stated:

The "say-on-pay" vote at our 2022 Annual Meeting, held on November 15, 2022, received strong support from our stockholders, with holders of nearly 90% of votes

cast on the proposal voting to approve the compensation of our named executive officers for the 2022 fiscal year. The Compensation Committee considered these results, along with specific feedback from stockholders, including those who voted against our 2022 say-on-pay proposal, in designing our 2023 fiscal year executive compensation program. Our 2023 program retained the same compensation structure, continuing to emphasize "at-risk" compensation to further align the interests of our named executive officers with those of our stockholders. Our Board believes that our 2023 executive compensation program was effective in upholding our compensation philosophy and goals, rewarding our named executive officers for our exceptionally strong operating performance while continuing to incentivize long-term value creation through long-term incentive awards linked to our stock price. For these reasons, the Board has concluded that the compensation of our named executive officers for the 2023 fiscal year should be approved by stockholders, and asks them to approve the following resolution:

"RESOLVED, that the compensation paid to the Company's named executive officers, as disclosed pursuant to Item 402 of Regulation S-K, including in the compensation tables and accompanying narrative discussion, is hereby APPROVED." . . .

The Board recommends that you vote "FOR" the approval of the compensation of our named executive officers as described in this Proxy Statement.

125.    The 2023 Proxy Statement further provided:

Informed oversight of our risk management policies and procedures is among the key functions of our Board. Specifically, the Board is responsible for fulfilling its oversight responsibilities regarding the Company's practices with respect to enterprise risk assessment and management, including exposure to any significant non-financial risks. While the Board has not established a separate risk management committee, the Board exercises its oversight of our risk management practices with the assistance of its existing standing committees, each of which addresses risks inherent in its respective area of oversight.

In conjunction with management and our independent auditor, the Audit Committee is responsible for reviewing our exposure to certain financial risks and assessing the policies and procedures, including investment policies, implemented by management to monitor and control our exposure to these risks. The Audit Committee is responsible for monitoring our compliance with legal and regulatory requirements and overseeing the performance of our external audit function.

The Compensation Committee is responsible for evaluating and discussing any risks associated with our compensation policies, plans, and practices that are reasonably likely to have a material adverse effect on the Company.

The Nominating and Corporate Governance Committee is responsible for monitoring the effectiveness of our corporate governance practices, including our Corporate Governance Guidelines, and evaluating the duties, functions, and composition of the various standing committees of the Board.

126.    On October 2, 2024, the Individual Defendants caused the Company to file an annual proxy statement with the SEC (the "2024 Proxy Statement"). The 2024 Proxy Statement solicited the Company's stockholders:

To elect two Class II directors named in this proxy statement to serve until the 2027 annual meeting of stockholders or until their successors are duly elected and qualified ("Proposal 1");

To ratify the appointment of Deloitte & Touche LLP as our independent registered public accounting firm for our fiscal year ending June 30, 2025 ("Proposal 2");

To approve, by non-binding advisory vote, the compensation of the Company's named executive officers ("Proposal 3"); and

To transact such other matters as may properly come before the meeting and any adjournment or postponement thereof.

127.    With respect to Proposal 1, the 2024 Proxy Statement stated:

Our Class II directors, whose term will expire at the Annual Meeting, are Earl H. "Trace" Devanny and Raymond F. Weldon. The Board has nominated Messrs. Devanny and Weldon for election as Class II directors at the Annual Meeting, and each of them has consented to (i) serve as a nominee, (ii) be named as a nominee in this Proxy Statement, and (iii) continue to serve as a director if elected. If elected, Messrs. Devanny and Weldon will serve as directors until the annual meeting of stockholders in 2027 and until their respective successors are elected and qualified, subject to earlier resignation or removal.

128.    With respect to Proposal 3, the 2024 Proxy Statement stated:

The "say-on-pay" proposal presented to stockholders in connection with 2023 Annual Meeting, held on November 14, 2023, received strong support from our stockholders, with holders of nearly 96% of votes cast on the proposal voting to approve the compensation of our named executive officers for the 2023 fiscal year. The Compensation Committee considered these results, along with specific feedback from stockholders, including those who voted against our 2023 say-on-pay proposal, in designing our 2024 fiscal year executive compensation program. Our 2024 program retained the same compensation structure, continuing to emphasize "at-risk" compensation to further align the interests of our named

executive officers with those of our stockholders. Our Board believes that our 2024 executive compensation program was effective in upholding our compensation philosophy and goals, rewarding our named executive officers for our exceptionally strong operating performance while continuing to incentivize long-term value creation through long-term incentive awards linked to our stock price. For these reasons, the Board has concluded that the compensation of our named executive officers for the 2024 fiscal year should be approved by stockholders, and asks them to approve the following resolution:

"RESOLVED, that the compensation paid to the Company's named executive officers, as disclosed pursuant to Item 402 of Regulation S-K, including in the compensation tables and accompanying narrative discussion, is hereby APPROVED." . . .

The Board recommends that you vote "FOR" the approval of the compensation of our named executive officers as described in this Proxy Statement.

129.    The 2024 Proxy Statement further provided:

Informed oversight of our risk management program is among the key functions of our Board. While management is responsible for day-to-day risk management activities, the Board reviews and monitors the Company's risk management program to ensure the program is consistent with the Company's strategy and objectives and effective in fostering a culture of risk-aware and risk-based decision making throughout the organization. Specifically, the Board considers whether the Company's practices and procedures are effective in identifying and assessing material and emerging risks, allocating risk management responsibility among management, developing and implementing effective risk management strategies, and facilitating appropriate risk related communication both within the organization and between management and the Board. While the Board has not established a separate risk management committee, the Board exercises its oversight of our risk management practices with the assistance of its existing standing committees, each of which addresses risks inherent in its respective area of oversight.

The Audit Committee is responsible for reviewing our exposure to certain financial risks and assessing the policies and procedures, including investment policies, implemented by management to monitor and control our exposure to these risks. The Audit Committee is also responsible for oversight of risks related to accounting and financial reporting, including our system of internal controls; legal and regulatory compliance; technology and information systems, including cybersecurity and data privacy; and compliance with Company policies, including the Code of Business Conduct and Ethics and Related Persons Transactions Policy. In exercising its oversight responsibilities with respect to these risks, the Audit Committee meets frequently with our internal audit team, independent auditors, and members of our executive team, both together and separately, to review ongoing

risk management initiatives and discuss relevant developments. In accordance with its charter, the Audit Committee is also responsible for the formal oversight of the Company's internal audit function.

The Compensation Committee is responsible for evaluating and discussing any risks associated with our compensation policies, plans, and practices that are reasonably likely to have a material adverse effect on the Company. The Compensation Committee also oversees risks related to human capital management and talent development, including management succession planning for members of senior management other than the Chief Executive Officer.

The Nominating and Corporate Governance Committee is responsible for monitoring the effectiveness of our corporate governance practices, including our Corporate Governance Guidelines, and evaluating the duties, functions, and composition of the various standing committees of the Board.

Each committee works closely with the appropriate members of management to align risk management activities with existing governance and compliance infrastructure in order to ensure enterprise-wide risk management is incorporated into the Company's business operations and strategy. Each committee reports to the full Board on the committee's activities, including discussions related to risk, on a quarterly basis, or more frequently as appropriate.

130.    The 2020, 2021, 2022, 2023, and 2024 Proxy Statements were materially false and misleading because they omitted, among other things, that: (i) between 2016 and at least 2021, the Company steered beneficiaries into Medicate Supplement and Medicare Advantage insurance plans offered by insurers that paid kickbacks to the Company, without the beneficiaries' knowledge and irrespective of the quality or suitability of the insurers' plans to the beneficiaries' individual needs; (ii) the Company's steering techniques included the use of "pods" of agents who exclusively or preferentially sold the Medicare Supplement and Medicare Advantage insurance plans of insurers that paid kickbacks to the Company; (iii) the Company set up subsidiaries, including Tiburon, that did not offer unbiased advice aligned to the specific needs of each customer but instead consisted of exclusive or semi-exclusive agents posing as unbiased agents; (iv) the Company used "suppression tools" to remove competing insurers from its internal quoting tool for agents to favor insurers that paid kickbacks, without regard for the best interests of beneficiaries;

(v) the Company's use of steering techniques in exchange for kickbacks violated state and federal laws and regulations, exposing the Company to potential civil and criminal liability and substantial reputational damage; (vi) the Company's steering practices were inconsistent with the Company's promise of providing "unbiased comparisons"; (vii) the Company's statements touting an "unbiased" comparison model were materially misleading without disclosing the historical steering practices between 2016 and 2021; (viii) by recommending that the Company's stockholders approve the named executive officer compensation, the Individual Defendants were wrongfully interested in increasing their compensation; and (ix) the Individual Defendants failed to fulfill their risk oversight responsibilities.

131.    Due to the Individual Defendants' materially false and misleading statements, the Company's stockholders voted to approve the Proposal referenced above.

***The Truth Emerges***

132.    The truth was revealed on May 1, 2025, when the DOJ announced that it filed the DOJ Complaint in the DOJ Action, asserting violations of the False Claims Act.

133.    The DOJ Complaint revealed, among other things, that: (i) "[f]rom 2016 through at least 2021," the Company received "tens of millions of dollars" in "illegal kickbacks" from health insurance companies in exchange for steering Medicare beneficiaries to enroll in the insurers' Medicare Advantage plans; (ii) the financial arrangements between the Company and insurers were falsely or misleadingly reported as "marketing" fees; (iii) in exchange for kickbacks, the Company engaged in conspiracies with Aetna and Humana to reduce enrollment of disabled beneficiaries; (iv) the Company made materially false claims by stating that it offers "unbiased coverage comparisons" when in it actually "repeatedly directed Medicare beneficiaries to the plans offered by insurers that paid them the most money, regardless of the quality or suitability of the

insurers' plans"; and (v)  there was a series of incriminating internal communications that demonstrate "[d]efendants knew what they were doing was illegal."

134.    The DOJ Complaint asserts claims against the Company for: (i) Violation of the False Claims Act: Presentation, or Causing Presentation, of False or Fraudulent Claims for Payment Resulting from a Violation of the Anti-Kickback Statute (31 U.S.C. § 3729(a)(1)(A)); (ii) Violation of the False Claims Act: Presentation, or Causing Presentation, of False or Fraudulent Claims for Payment (31 U.S.C. § 3729(a)(1)(A)); (iii) Violation of the False Claims Act: Presentation, or Causing Presentation, of False or Fraudulent Claims for Payment (31 U.S.C. § 3729(a)(1)(A)); (iv) Violation of the False Claims Act: False Records or Statements Material to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B)); (v) Violation of the False Claims Act: False Records or Statements Material to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B)); (vi) Violation of the False Claims Act: Conspiracy to Violate 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B) (31 U.S.C. § 3729(a)(1)(C)); (vii) Violation of the False Claims Act: Conspiracy to Violate 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B) (31 U.S.C. § 3729(a)(1)(C)); and (viii) Unjust Enrichment.

135.    The DOJ announced the DOJ Action in a press release issued on May 1, 2025, which provided:

> The United States filed a complaint today under the False Claims Act (FCA) against three of the nation's largest health insurance companies — Aetna Inc. and affiliates, Elevance Health Inc. (formerly known as Anthem), and Humana Inc. — and three large insurance broker organizations — eHealth, Inc. and an affiliate, GoHealth, Inc., and SelectQuote Inc. The United States alleges that from 2016 through at least 2021, the defendant insurers paid hundreds of millions of dollars in illegal kickbacks to the defendant brokers in exchange for enrollments into the insurers' Medicare Advantage plans.
>
> Under the Medicare Advantage (MA) Program, also known as Medicare Part C, Medicare beneficiaries may choose to enroll in health care plans (MA plans) offered by private insurance companies, such as defendants Aetna, Anthem, and

Humana. Many Medicare beneficiaries rely on insurance brokers to help them choose an MA plan that best meets their individual needs. Rather than acting as unbiased stewards, the defendant brokers allegedly directed Medicare beneficiaries to the plans offered by insurers that paid brokers the most in kickbacks, regardless of the suitability of the MA plans for the beneficiaries. According to the complaint, the broker organizations incentivized their employees and agents to sell plans based on the insurers' kickbacks, set up teams of insurance agents who could sell only those plans, and at times refused to sell MA plans of insurers who did not pay sufficient kickbacks.

The United States further alleges that Aetna and Humana each conspired with the broker defendants to discriminate against Medicare beneficiaries with disabilities whom they perceived to be less profitable. Aetna and Humana allegedly did so by threatening to withhold kickbacks to pressure brokers to enroll fewer disabled Medicare beneficiaries in their plans. The United States alleges that, in response to these financial incentives from Aetna and Humana, the defendant brokers or their agents rejected referrals of disabled beneficiaries and strategically directed disabled beneficiaries away from Aetna and Humana plans.

"Health care companies that attempt to profit from kickbacks will be held accountable," said Deputy Assistant Attorney General Michael Granston of the Justice Department's Civil Division. "We are committed to rooting out illegal practices by Medicare Advantage insurers and insurance brokers that undermine the interests of federal health care programs and the patients they serve."

"It is concerning, to say the least, that Medicare beneficiaries were allegedly steered towards plans that were not necessarily in their best interest – but rather in the best interest of the health insurance companies," said U.S. Attorney Leah B. Foley for the District of Massachusetts. "The alleged efforts to drive beneficiaries away specifically because their disabilities might make them less profitable to health insurance companies are even more unconscionable. Profit and greed over beneficiary interest is something we will continue to investigate and prosecute aggressively. This office will continue to take decisive action to protect the rights of Medicare beneficiaries and vulnerable Americans."

The lawsuit was originally filed under the qui tam or whistleblower provisions of the FCA. Under the FCA, private parties can file an action on behalf of the United States and receive a portion of the recovery. The FCA permits the United States to intervene in and take over the action, as it has done here. If a defendant is found liable for violating the FCA, the United States may recover three times the amount of its losses plus applicable penalties.

The Justice Department's Civil Division, Commercial Litigation Branch, Fraud Section and the U.S. Attorney's Office for the District of Massachusetts are handling the matter, with valuable assistance from the Department of Health and Human Services (HHS) Office of Inspector General and the FBI.  The case is

captioned *United States ex rel. Shea v. eHealth, et al.*, No. 21-cv-11777.

Trial Attorneys David G. Miller, Anna H. Jugo, Diana E. Curtis, and Sara B. Hanson of the Justice Department's Civil Division and Assistant U.S. Attorneys Charles Weinograd and Julien Mundele for the District of Massachusetts are handling the matter.

The investigation and prosecution of this matter illustrates the government's emphasis on combating healthcare fraud. One of the most powerful tools in this effort is the FCA. Tips and complaints from all sources about potential fraud, waste, abuse, and mismanagement, can be reported to HHS at 800-HHS-TIPS (800-447-8477).

136.    Following this news, the Company's stock price fell 19.2 percent, or $0.61 per share, to close at $2.56 per share on May 1, 2025.

*Insider Sales*

137.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendants Danker, Grant, and Sadun sold significant portions of Company common stock while in possession of non-public information concerning the Company's financial condition and business prospects.

138.    While the Company's stock price was artificially inflated, Defendant Danker sold approximately 187,880 shares of Company common stock, totaling proceeds of approximately $5,007,837.31. Defendant Danker made the following sales of Company stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 01/20/2021 | 12,900 | $25.01 | $322,629.00 |
| 01/22/2021 | 8,230 | $25.02 | $205,914.60 |
| 01/25/2021 | 21,642 | $25.12 | $543,647.04 |
| 02/05/2021 | 23,269 | $25.12 | $584,517.28 |
| 02/09/2021 | 54,827 | $27.05 | $1,483,070.35 |
| 02/11/2021 | 51,708 | $27.10 | $1,401,286.80 |
| 02/23/2021 | 1,700 | $30.02 | $51,034.00 |
| 02/25/2021 | 13,604 | $30.56 | $415,738.24 |

139.    While the Company's stock price was artificially inflated, Defendant Grant sold approximately 169,701 shares of Company common stock, totaling proceeds of approximately $4,853,434.57. Defendant Grant made the following sales of Company stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 01/20/2021 | 12,838 | $25.01 | $321,078.38 |
| 01/22/2021 | 8,412 | $25.02 | $210,468.24 |
| 01/25/2021 | 21,598 | $25.12 | $542,541.76 |
| 02/10/2021 | 34,326 | $27.10 | $930,234.60 |
| 02/22/2021 | 14,703 | $30.01 | $441,237.03 |
| 02/24/2021 | 77,824 | $30.94 | $2,407,874.56 |

140.    While the Company's stock price was artificially inflated, Defendant Sadun sold approximately 217,527 shares of Company common stock, totaling proceeds of approximately $5,620,734.62. Defendant Sadun made the following sales of Company stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 01/22/2021 | 49,724 | $25.17 | $1,251,553.08 |
| 02/05/2021 | 81,744 | $25.06 | $2,048,504.64 |
| 02/08/2021 | 21,559 | $25.10 | $541,130.90 |
| 02/12/2021 | 100 | $27.50 | $2,750.00 |
| 02/16/2021 | 64,400 | $27.59 | $1,776,796.00 |

141.    In total, during the Relevant Period, these three Individual Defendants' lucrative insider sales netted proceeds of approximately $15,482,006.50.

142.    As a result of these insider sales, Defendants Danker, Grant, and Sadun were unjustly enriched.

***Harm to the Company***

143.    As a result of the foregoing, the DOJ Action was filed against the Company, captioned *United States of America v. eHealth, Inc., et al.*, Case No. 21-cv-11777 (D. Mass.).

144.    Moreover, the Securities Class Action was filed against the Company, Danker, Clement, Sadun, and Grant, captioned *Pahlkotter v. SelectQuote, Inc*., Case No. 1:25-cv-06620 (S.D.N.Y.).

145.    As a result of the DOJ Action and Securities Class Action, SelectQuote has incurred, and will continue to incur, substantial costs to defend itself and is exposed to massive potential liability.

146.    Furthermore, the Company has also suffered and will continue to suffer a loss of reputation and goodwill.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

147.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

148.    Plaintiff will adequately and fairly represent the interests of SelectQuote and its shareholders in enforcing and prosecuting its rights.

149.    SelectQuote is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

150.    Plaintiff is a current shareholder of SelectQuote and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

151.    A pre-suit demand on the Board of SelectQuote is futile and, therefore, excused.

152.    At the time this action was commenced, the eight-person Board consisted of Individual Defendants Hawks, Danker, Devanny, Devine, Weldon, Patel, Vukovic, and Wolfe (the

"Director Defendants"). Accordingly, Plaintiff is only required to show that four Director Defendants cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for the misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

153.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

154.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

155.    Each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

156.    As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims.  Specifically, as Board members of SelectQuote, the Director Defendants knew, or

should have known, the material facts surrounding SelectQuote's internal control mechanisms.

157.    Director Defendant Danker is not disinterested or independent. Danker is CEO of the Company, and he derives substantial compensation from his relationship with the Company. As alleged above, Danker was directly involved in and perpetrated the scheme alleged herein. In addition, Danker engaged in improper insider sales while in possession of material non-public information about the Company, netting total proceeds of over $15.48 million. Danker also signed the various SEC filings referenced above, which contained materially false and misleading statements, including the Forms 8-K, 10-Q, and 10-K. Moreover, Danker was named as a defendant and, therefore, faces a substantial likelihood of liability, in the Securities Class Action based on substantially the same wrongdoing alleged herein. Thus, Danker is not disinterested or independent.

158.    Director Defendants Hawks, Danker, Devanny, Devine, Weldon, and Patel each solicited the 2020, 2021, 2022, 2023, and 2024 Proxy Statements, which led to the reelection of the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Accordingly, these Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile, and, therefore, excused.

159.    Director Defendants Devanny, Devine, and Weldon (the "Audit Defendants") served on the Company's Audit Committee during the Relevant Period, and pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business,

finances, and operations, as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

160.    Director Defendants Hawks, Devine, and Patel (the "Nominating and Corporate Governance Defendants") served on the Company's Nominating and Corporate Governance Committee during the Relevant Period, and pursuant to the Nominating and Corporate Governance Committee Charter, were specifically charged with the responsibility to oversee the corporate governance policies and procedures of the Company. At all relevant times, however, the Nominating and Corporate Governance Defendants breached their fiduciary duty to the Company by failing to review regulatory developments and governance best practices for the Company and allowed the Individual Defendants to disseminate material misinformation as set forth above. Therefore, the Nominating and Corporate Governance Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

161.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

162.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

163.    Additionally, the Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

164.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct.  The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct.  The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

165.    Accordingly, a pre-suit demand on the Board is futile and, therefore, excused.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

166.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

167.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

168.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

169.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and

procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

170.    Furthermore, Individual Defendants Danker, Grant, and Sadun engaged in insider sales during the Relevant Period while the price of the stock was artificially inflated, netting millions of dollars in proceeds for themselves.

171.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

172.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action and the DOJ Action, exposing the Company to millions of dollars in potential damages, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT II

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

173.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

174.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

175.    Plaintiff, on behalf of SelectQuote, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

176.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

177.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, SelectQuote.

178.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from SelectQuote that was tied to the performance or artificially inflated valuation of SelectQuote, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

179.    Moreover, as alleged herein, Individual Defendants Danker, Grant, and Sadun engaged in improper insider sales while in possession of material non-public information about the Company, netting total proceeds of over $15.48 million.

180.    Plaintiff, as a shareholder and a representative of SelectQuote, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and

breach of their fiduciary and contractual duties.

181.    Plaintiff on behalf of SelectQuote has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Waste of Corporate Assets

182.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

183.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

184.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action and the DOJ Action.

185.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

186.    Plaintiff, on behalf SelectQuote, has no adequate remedy at law.

## COUNT V

### Against Individual Defendants Danker, Clement, Sadun, and Grant for Contribution Under Sections 10(b) and 21D of the Exchange Act

187.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

188.    SelectQuote and Individual Defendants Danker, Clement, Sadun, and Grant are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated

thereunder by the SEC. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole, or in part, due to Individual Defendants Danker's, Clement's, Sadun's, and Grant's willful and/or reckless violations of their obligations as officers and/or directors of SelectQuote.

189.    Defendants Danker, Clement, Sadun, and Grant, because of their positions of control and authority as officers and/or directors of SelectQuote, were able to, and did, directly and/or indirectly, exercise control over the business and corporate affairs of SelectQuote, including the wrongful acts complained of herein and in the Securities Class Action.

190.    Accordingly, Defendants Danker, Clement, Sadun, and Grant are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

191.    As such, SelectQuote is entitled to receive all appropriate contribution or indemnification from Defendants Danker, Clement, Sadun, and Grant.

192.    Plaintiff, on behalf SelectQuote, has no adequate remedy at law.

## COUNT VI

**Against the Individual Defendants for Violations of Section 14(a)**
**of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)**

193.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

194.    The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

195.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce

or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

196.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9

197.    The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2020, 2021, 2022, 2023, and 2024 Proxy Statements, which were filed with the SEC.

198.    As alleged above, the 2020, 2021, 2022, 2023, and 2024 Proxy Statements were materially false and misleading because they omitted, among other things, that: (i) between 2016 and at least 2021, the Company steered beneficiaries into Medicate Supplement and Medicare Advantage insurance plans offered by insurers that paid kickbacks to the Company, without the beneficiaries' knowledge and irrespective of the quality or suitability of the insurers' plans to the beneficiaries' individual needs; (ii) the Company's steering techniques included the use of "pods" of agents who exclusively or preferentially sold the Medicare Supplement and Medicare Advantage insurance plans of insurers that paid kickbacks to the Company; (iii) the Company set up subsidiaries, including Tiburon, that did not offer unbiased advice aligned to the specific needs of each customer but instead consisted of exclusive or semi-exclusive agents posing as unbiased

agents; (iv) the Company used "suppression tools" to remove competing insurers from its internal quoting tool for agents to favor insurers that paid kickbacks, without regard for the best interests of beneficiaries; (v) the Company's use of steering techniques in exchange for kickbacks violated state and federal laws and regulations, exposing the Company to potential civil and criminal liability and substantial reputational damage; (vi) the Company's steering practices were inconsistent with the Company's promise of providing "unbiased comparisons"; (vii) the Company's statements touting an "unbiased" comparison model were materially misleading without disclosing the historical steering practices between 2016 and 2021; (viii) by recommending that the Company's stockholders approve the named executive officer compensation, the Individual Defendants were wrongfully interested in increasing their compensation; and (ix) the Individual Defendants failed to fulfill their risk oversight responsibilities.

199.    The misrepresentations and omissions in the 2020, 2021, 2022, 2023, and 2024 Proxy Statements were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the 2020, 2021, 2022, 2023, and 2024 Proxy Statements, including, but not limited to, the reelection of certain Individual Defendants and the approval of the named executive officer compensation.

200.    The Company was damaged as a result of Defendants' material misrepresentations and omissions in the 2020, 2021, 2022, 2023, and 2024 Proxy Statements.

201.    As a result of the Individual Defendants' material misrepresentations and omissions, the Company has sustained significant damages.

202.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to:

• strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

• strengthening the Company's internal reporting and financial disclosure controls;

• developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

• strengthening the Board's internal operational control functions;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: January 29, 2026

**RIGRODSKY LAW, P.A.**

By:   */s/ Gina M. Serra*

**OF COUNSEL:**

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
jgrabar@grabarlaw.com

Gina M. Serra
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Facsimile: (302) 654-7530
gms@rl-legal.com

*Attorneys for Plaintiff*